# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| RIVER EAST PLAZA, L.L.C., f/k/a<br>MCL CLYBOURN SQUARE SOUTH, L.L.C.,<br>a Delaware Limited Liability Company,<br><br>    Plaintiff/Counterdefendant<br><br>v.<br><br>THE VARIABLE ANNUITY LIFE<br>COMPANY, a Texas Corporation,<br><br>    Defendant/Counterclaimant/<br>    Third-Party Plaintiff,<br><br>v.<br><br>DANIEL E. McLEAN,<br><br>    Third-Party Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)   No: 03 C 4354<br>)<br>)   Judge John W. Darrah<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## OPINION AND ORDER

Plaintiff, River East Plaza, L.L.C. f/k/a MCL Clybourn Square South, L.L.C., filed suit against Defendant, The Variable Annuity Life Insurance Company ("VALIC"), seeking a declaratory judgment that a prepayment fee provision in a commercial loan is an unenforceable penalty (Count I) and alleging breach of contract (Count II). VALIC filed a counterclaim against River East for costs and attorney's fees, which are recoverable under the loan if River East does not prevail. VALIC also filed a third-party claim against Daniel E. McLean – who personally guaranteed the loan – for costs, fees, and expenses incurred by VALIC.

This matter now comes before the Court following the presentation of evidence during a bench trial. The Court has considered the evidence, including the testimony of witnesses and exhibits, and has further considered the written arguments of counsel for the parties and the authority cited therein. The Court weighed whether the testimony of each witness, both lay and expert, was truthful and accurate (in part, in whole, or not at all) and decided what weight, if any, to give to the testimony of each witness. In making this determination, the Court considered, among other things: the ability and opportunity the witness had to see, hear, or know the things about which the witness testified; the witness's memory; any interest, bias or prejudice the witness may have; the witness's intelligence; the manner of the witness while testifying; and the reasonableness of the witness's testimony in light of all of the evidence in the case. *See* Fed. Civ. Jury Instr. 7th Cir. §§ 1.13, 1.21 (2005).

Pursuant to Federal Rule of Civil Procedure 52, the Court enters the following Findings of Fact and Conclusions of Law based upon consideration of all admissible evidence and the Court's assessment of the credibility of the witnesses. To the extent, if any, that Findings of Fact, as stated, may be considered Conclusions of Law, they shall be deemed Conclusions of Law. Similarly, to the extent, if any, that Conclusions of Law, as stated, may be considered Findings of Fact, they shall be deemed Findings of Fact.

## FINDINGS OF FACT

River East was formerly known as MCL Clybourn Square South, L.L.C ("MCL"). MCL operated under the umbrella of the MCL Companies. The MCL Companies consisted of two managing members, Daniel E. McLean ("McLean") and Kotter & Company. VALIC was a wholly-owned subsidiary of American General Corporation ("AG"). AG operated an investment subsidiary

named American General Realty Advisors ("AGRA"). Acting on behalf of AG and some of its life insurance subsidiaries, AGRA identified and underwrote loans to be secured by mortgages on commercial real estate mortgages ("CREM"). In August 2001, AG merged with the American International Group, Inc. ("AIG").

In November 1999, MCL engaged the services of L.J. Melody & Company ("LJM") to obtain mortgage financing for a commercial real estate located and known as 2700 North Clybourn Avenue in Chicago, Illinois (the "Property"). John Clifford and Mark Pasquella acted on LJM's behalf in connection with obtaining the mortgage financing for the Property.

In early November 1999, LJM, on behalf of MCL, solicited a CREM loan, secured by first-mortgage financing from AGRA. LJM requested that AGRA, through Jeffrey Flinn, an AG loan officer, provide a non-recourse, first mortgage in the amount of $13,000,000 with a 20-year loan term, 28-year amortization, and an interest rate of 185 basis points (one basis point equals 0.01%) over the average life of treasuries. On or about November 11, 1999, LJM conveyed to MCL AGRA's proposal to provide mortgage financing for the Property under the following terms:

| | |
|---|---|
| Loan Amount: | The lesser of $12,500,000, or, 85% of the appraised "40-year leased fee estate value" (estimated at $15,950,000) |
| Interest Rate: | Fixed: 185 basis points over the interpolated average life Treasuries |
| Term: | Twenty (20) years |
| Amortization: | Twenty-five (25) years |
| Recourse: | None, except for industry standard carve-outs |
| Application Deposit: | One-percent (1.0%), Refundable |
| Commitment Fee: | One-percent (1.0%), Non-Refundable |
| Origination Fee: | One-percent (1.0%), payable to L.J. Melody |
| Closing: | Prior to 12/31/99 |
| Prepayment: | Yield Maintenance for duration of term |

3

LJM provided MCL with a Loan Application and Commitment that had previously been prepared by AGRA and its attorneys. On or about November 22, 1999, MCL executed the Commitment. On or about December 9, 1999, AGRA approved and executed the Commitment and determined to place the loan ("the Loan") with AG's subsidiary, VALIC.

Between November 22, 1999 and December 17, 1999, representatives and agents on behalf of MCL and VALIC negotiated and prepared various documents used in connection with the Loan financing, including a Promissory Note in favor of VALIC in the amount of $12,700,000 ("the Note") and a Mortgage and Security Agreement, dated December 23, 1999 ("the Mortgage"), on the Property.

Paragraph 23 of the Commitment and Paragraph 4 of the Note contain a prepayment provision that provides, in relevant part:

Prepayment of this Note shall be permitted only in accordance with the following terms and conditions:

(a) [Plaintiff] shall have the right to prepay the entire outstanding unpaid principal balance (but not any lesser amount except as permitted in Paragraph 4(b) herein) of this Note, together with interest on the unpaid principal balance hereof then outstanding, on any regular monthly installment date for the payment of principal and interest hereunder, provided that (i) [Defendant] shall have received at least sixty (60) days' prior written Notice (the "Notice") of such full prepayment, (ii) at the time specified in the Notice for any prepayment there shall be no default under this Note or under any of the other Security Instruments and (iii) such prepayment is accompanied by a prepayment fee in an amount equal to the lesser of (x) an amount which, when added to all the other sums received, charged, or contracted for by [Defendant] which are interest or are deemed to be interest by applicable law, does not exceed the Maximum Lawful Rate or (y) the greater of an amount calculated as set forth in Paragraphs (1) or (2) (as applicable), below:

(1) at the time of receipt by [Defendant] of the Notice, the difference between (a) the then present value of all unpaid installments of principal and interest due and payable under this Note, calculated from the date of the proposed prepayment to the Maturity Date, discounted at the "Reinvestment Rate" (as hereinafter defined) and (b) the

4

outstanding principal balance under this Note on the date of the proposed prepayment; or

(2) one percent (1%) of the then outstanding principal balance of this Note.

As used in this Note, "<u>Reinvestment Rate</u>" shall be the yield to maturity on a United States Treasury bond or note (the choice of which security to be used for such purposes being in the sole discretion of [Defendant]) having a maturity date of January 2, 2020 (or the maturity date closest thereto if no such bond or note has a maturity date of January 2, 2020). (Emphasis in original).

This prepayment provision was the standard provision that AG included in its 1999 loans; and Jeffrey Flinn, VALIC's loan officer, was unaware of any instance in which a borrower was able to negotiate a change in the provision in 1999. VALIC produced one promissory note from 1999 that contained a different prepayment provision than in the instant case. However, twenty other 1999 promissory notes for other loans contained the identical prepayment provision.

On reviewing the Note's draft terms and discussing those terms with her partners, MCL's counsel – Felice Bressler of the law firm of Schiff, Hardin & Waite – formed the opinion that the prepayment provision was punitive in nature and possibly unenforceable under Illinois law. Based on this opinion, Bressler proposed that the prepayment provision be removed. Bressler informed VALIC's counsel of her belief that the prepayment penalty may be unenforceable and offered to provide VALIC's counsel, Douglas Yeager, with legal authority supporting that belief. VALIC's counsel responded that the terms of the prepayment provision represented his client's "form" document and were non-negotiable.[1]

---

[1] Bressler's testimony in this regard was credible and persuasive. Yeager testified only that he could not recall the conversation. In addition, notes taken on the draft opinion letter support Bressler's testimony that she and Yeager spoke about the possible unenforceability of the prepayment provision because it may be a penalty.

As a condition of closing, VALIC required MCL's counsel to prepare an opinion letter with respect to the terms of the Loan transaction. VALIC required that MCL's counsel affirm that the Note and all other documents executed in connection with the transaction constituted a legal, valid and binding obligation of MCL and were enforceable in accordance with their respective terms. On December 15, 1999, Bressler sent a draft opinion letter to VALIC. In the draft letter, Bressler stated, in pertinent part, that Schiff, Hardin expressed "no opinion as to the enforceability of any provision in any Document providing for a prepayment premium in the event of (i) an acceleration of the Loan after default, (ii) such premium is held to be a penalty or . . . ." Bressler intended this language to express a "carve-out" of the enforceability of the prepayment provision from her otherwise positive legal opinion regarding the transaction. VALIC's counsel questioned the "carve-out" and was informed by Bressler that she could not provide a positive opinion as to the enforceability of the prepayment provision.

On December 17, 1999, the parties executed various documents in connection with the Loan, including the Note and Mortgage that had been prepared by VALIC's attorneys. The interest rate on the Loan was 8.02% for a term of twenty years. The Commitment and Note contained the above-quoted prepayment provision. That same day, VALIC tendered $12.7 million to MCL in consideration of the Note and Mortgage. On December 21, 1999, Schiff, Hardin issued its opinion letter containing the same "carve-out" language quoted above. If every payment of the Loan had been made in accordance with the terms of the Note from the date of inception to maturity, River East would have paid approximately $16,478,855 in interest to VALIC.

Paragraph Seven of the Loan contains an attorney's fee provision whereby VALIC may recoup attorney's fees if it is the prevailing party in litigation. In signing the loan, McLean executed

6

a Limited Personal Guaranty, which provides that McLean is personally liable for Guaranteed Obligations. The term "Guaranteed Obligations" is defined in section 1.1 of the Personal Guaranty as including "all obligations for which [Defendant] has full recourse to [Plaintiff] pursuant to <u>Section 19</u> of this Note" and all costs, attorney's fees, and expenses Defendant incurs in enforcing the Personal Guaranty. Section 19 of the Note provides, in pertinent part, that:

> The liability of [Plaintiff] for failure to perform [Plaintiff]'s obligations hereunder or under the Mortgage and the other Security Instruments is expressly limited to the security for payment of this Note, the same being all properties, rights, and estates subject to the Security Instruments, and [Defendant] agrees not to seek any damages or money judgment against [Plaintiff] for any default on the part of [Plaintiff] under this Note or any of the Security Instruments. Notwithstanding anything to the contrary contained in this Note or in any of the Security Instruments, and notwithstanding any delay on the part of [Defendant] in exercising any right, power or remedy in connection with any default under this Note, the Mortgage or any of the other Security Instruments, [Defendant] shall have full recourse against [Plaintiff], and [Plaintiff] shall be personally liable for and shall promptly account (by delivery of funds) to [Defendant] for (a) all condemnation awards and proceeds and insurance proceeds actually received . . . (b) all amounts necessary to repair any damage to the Mortgaged Property . . . (j) any loss, damage or injury sustained by [Defendant] arising from the breach of any of the warranties, representations, covenants or indemnities contained in the Environmental Indemnification Agreement (as defined in the Mortgage); and (k) all costs, attorney's fees and expenses incurred or expended by [Defendant] in collecting any of the foregoing or due to any default in the performance of the foregoing or in enforcing any right granted to [Defendant] under <u>Section 19</u> of this Note.

In the fall of 2002, MCL decided to sell the Property. Costco Wholesale Corp. ("Costco"), the current tenant of the Property, was to purchase the Property without assuming the outstanding VALIC loan.

In anticipation of the sale of the property to Costco, on or about December 27, 2002, MCL sent, via facsimile, a request for a payoff letter. The loan payoff statement received by MCL stated

that, based on a requested payoff date of January 6, 2003, the outstanding principal was $12,366,590.30 and the prepayment premium due was $3,808,505.

On January 6, 2003, MCL sold the Property to Costco. Under the terms of the sale, MCL retained its obligation to pay the mortgage and did so over the next several months as it tried to negotiate a reduction of the prepayment fee with VALIC.

On February 21, 2003, MCL changed its name to River East Plaza, L.L.C.

At approximately 4:00 p.m. on April 21, 2003, River East gave notice to VALIC of its intention to pay the loan on July 1, 2003, and requested a loan payoff statement via facsimile. On VALIC's copy of the facsimile appears two transmission confirmation lines. One line indicates that the facsimile from River East was sent on April 21, 2003, at 15:35 hours. The second facsimile-generated line states that a fax "FR [from River East]" was received on April 22, 2003, at 15:15 hours. River East's facsimile cover sheet states the facsimile was sent on April 21, 2003.

VALIC insisted that MCL repay the Loan under the terms of the prepayment provision in Paragraph 4 of the Note cited above. On June 12, 2003, VALIC provided River East with a Loan Payoff Statement ("the Statement"). The Statement included a prepayment premium due of $4,713,601.27, an amount equal to approximately 38.32% of the outstanding principal balance of the Loan (which then was $12,301,215.38).

As of April 21, 2003, the yield to maturity on the United States Treasury bond having a maturity date of January 2, 2020 (or the maturity date closest thereto if no such bond or note has a maturity date of January 2, 2020) was 4.75%. As of June 2, 2003, the yield to maturity on the United States Treasury bond having a maturity date of January 2, 2020 (or the maturity date closest thereto if no such bond or note has a maturity date of January 2, 2020) was 4.18%. In its June 12, 2003

8

calculation of the prepayment premium, VALIC used the June 2, 2003 yield-to-maturity rate as the "Reinvestment Rate." VALIC erred in using this yield-to-maturity rate of June 2, 2003, rather than as of the date VALIC received River East's request for a payoff letter.[2] Assuming the enforceability of the prepayment provision, VALIC's use of the incorrect maturity date resulted in an excess of payment due of $828,514 as of July 1, 2003, if the notice to prepay was received on April 21, 2003; and $826,922.27 if the notice to prepay was received on April 22, 2003 (a difference of $1,592.73).[3]

On June 16, 2003, MCL brought an action in the Circuit Court of Cook County, seeking a declaration that it would not have to pay the prepayment fee because the prepayment provision constituted an unenforceable penalty clause. On June 25, 2003, VALIC removed the suit to this Court pursuant to 28 U.S.C. § 1441.

To preserve its right to prepay the Loan at the amount stated in the June 12, 2003 Loan Payoff Statement and to prevent the accrual of additional fees, River East paid a prepayment premium fee of $4,713,601.27. Prepaid mortgage proceeds, including the River East payment, were deposited directly by VALIC into its general account and were not segregated. VALIC did not purchase a portfolio of Treasury securities in 2003 large enough to cover the prepaid Loan.

---

[2]This was one of several errors VALIC made in calculating the prepayment fee. On December 30, 2002, MCL received a payoff statement, indicating that the prepayment fee was $4,1999,265. As mentioned above, on January 6, 2003, MCL received another payoff statement, indicating a prepayment fee of $3,808,505. This prepayment fee amounted to approximately 30.80% of the then-outstanding principal balance of the Loan. In April 2003, VALIC calculated the prepayment fee at $5,173,207.19. The June 12, 2003 payoff statement indicated a prepayment fee of $4,713,601.27. This prepayment fee amounted to approximately 38.32% of the then-outstanding principal balance of the Loan.

[3]This error was discovered after River East filed suit. Accordingly, River East has prevailed (to this extent) in that VALIC recognized its error after the suit was filed and has credited River East $826,922.27.

J.F. Chip Morrow -- River East's expert, who has over 35 years of mortgage lending experience, including commercial real estate loans, with various financial institutions -- rendered opinions as to the prepayment provision. Morrow's testimony was credible and persuasive. The type of prepayment provision at issue is known as a yield-maintenance clause, which is used to compensate lenders for possible lost interest if the loan is prepaid. The purpose of the yield-maintenance clause is to make the lender whole on a similar investment; this is achieved by the borrower paying to the lender the interest spread between the current loan rate and the new investment vehicle chosen by the lender so that the lender is financially "indifferent" to being prepaid. The yield-maintenance amount is generally calculated by taking a base instrument, commonly either Treasury notes or government securities, and applying a "hand-picked" spread to that base so that it mirrors a like investment similar to the loan sought to be prepaid.

For example, as to the December 17, 1999 Loan at issue, the interest rate was 8.02%. Treasury notes at that time were approximately 6.75%; resulting in a spread of 127 points (one basis point equals 0.01%). This is the amount, referred to as the differential or discount rate, that would be added to the rate at that date to make VALIC financially "indifferent" to the proposed prepayment because VALIC would be fully compensated as though the loan had been paid over the entire term. A spread of 127 points could have been calculated in 1999 and included at the time the loan was executed.

On April 21, 2003, the Treasury rate was 4.75%. Adding the risk differential of 127 basis points equals 6.02%. Subtracting 6.02 for the fixed rate of the Loan of 8.02% equals 2.0% -- the then-present value of the CREM Loan to VALIC.

10

The use of Treasuries as the reinvestment rate can overcompensate a lender if it does not have a differential added because the lender can purchase a Treasury without the risk present in the CREM loan because a Treasury security is backed by the United States Government. A CREM loan compensates the lender for taking the comparatively higher risks of default and impairment to collateral by receiving a premium interest rate. Therefore, the prevailing interest rate on a CREM loan is higher than the interest rate paid on a Treasury security with the same maturity date. VALIC's average real estate loan was 132 basis points over the average Treasury bill rate based on VALIC's financial statements from the first quarter of 1999 through the second quarter of 2004.

Data on the average monthly yield on U.S. Treasury Securities with a constant maturity of 20 years, as published by the Federal Reserve System for the period between 1978 and 1998, established that over this 20-year period, and not including anything yielding over 8.02%[4], U.S. Treasury Bonds: never dropped 127 points in a 60-day period; dropped more than 127 basis points once over a six-month period (by an additional 4 points); and dropped more than 127 basis points twice in an eight-month period. In the same 20-year time period, but with the inclusion of all yields (8.02% and greater), U.S. Treasury Bonds fell by more than 127 basis points 31 times within an 8-month period and 21 times within a 6-month period. This data was available at the time the instant loan was executed and could have been used in calculating a reasonable spread to be used as a differential rate to help insure that VALIC was fully compensated for the Loan but would not receive a windfall. There was no drop of 127 points from 1999 to 2000.

---

[4]Anything at a yield rate of 8.02% or above can be excluded because that is the rate of the Loan; therefore, if a spread of 127 basis points is assumed, any rate that was 8.02% or higher would be irrelevant because if the rate dropped 127 basis points, VALIC would sill get one hundred percent of the reinvestment rate.

11

In 1999, VALIC priced its mortgage loan interest rates as the sum of the yield on the then-prevailing U.S. Treasury rate for an "average life" security, plus a spread usually expressed in terms of basis points. The spread between the yield on U.S. Treasury securities and mortgage interest rates that VALIC obtains from borrowers varied subject to the risk of the transaction, the duration of the loan, negotiation, and prevailing market conditions.[5]

In the normal course of business, VALIC required between four and eight weeks, from the time of initial contact with a potential borrower, to enter into an executed commitment for a CREM loan. This would be accomplished in as few as 30 days or as many as four months. During 1999, AG was able to execute loans on between 1-in-6 and 1-in-10 loan opportunities presented to it.

VALIC, at all relevant times, could have reinvested the prepaid funds in a comparable-risk investment to the original loan within one day of receipt of River East's notice of intent to prepay or of actual receipt of the prepaid funds. In 2003, less than 0.5% of VALIC's investment purchases consisted of Treasury securities. The vast bulk of VALIC's investment purchases were government agency securities, such as Ginnie Mae's and Freddie Mae's (45.1%) and corporate bonds (50.9%). These securities have a higher rate of risk of return than Treasury securities because of the collateral backing them and are more comparable to a CREM loan than they are to Treasury securities. VALIC was knowledgeable regarding these securities and bonds and their availability at the time the MCL

---

[5] In 1999, VALIC acquired 23 mortgage loans. The interest rates on the mortgages ranged from 6.52% to 8.53%. In 2000, VALIC acquired 18 mortgage loans. The interest rates on the mortgages ranged from 7.18% to 8.60%. In 2001, VALIC acquired 13 mortgage loans. The interest rates on the mortgages ranged from 7.10% to 8.05%. In 2002, VALIC acquired 21 mortgage loans. The interest rates on the mortgages ranged from 5.05% to 7.62%. In 2003, VALIC acquired 32 mortgage loans. The interest rates on the mortgages ranged from 4.67% to 7.60%.

Loan was executed and at the time of prepayment. VALIC could have purchased a $13 million portfolio of government agency securities or corporate bonds within a day of the decision to make such a purchase. VALIC had sufficient funds to make a $13 million investment of any type.

Three weeks after the River East prepayment, VALIC made a commercial real estate loan in Fort Wayne, Indiana, that could have completely replaced the River East Loan and that would have, with the additional investment of the prepayment fee, provided a rate of return of 173 basis points higher than the original loan. Had the prepayment provision added a risk-differential spread of 127 basis points, to the treasury rate, the Fort Wayne loan would have provided an effective interest rate of 8.48% over the remaining term. Thus, the 127 spread, which could have been calculated in 1999 and included in the prepayment provision, would have fully compensated VALIC for the 1999 Loan.

Other of VALIC's actual investments, made within a month-and-a-half of the River East prepayment, could have replaced the River East Loan and would have provided VALIC with a rate of return higher than the River East Loan on a nearly-comparable risk investment. Certain of VALIC's investments in government agency securities were large enough to have replaced the River East Loan and provide VALIC with a rate of return of 190 to 249 basis points higher than the reinvestment rate of 4.75%. Certain of VALIC's corporate bond investments could have replaced the Loan with a rate of return 212 to 793 basis points higher than the reinvestment rate of 4.75%. Thus, the 127 spread, which could have been reasonably calculated in 1999 and included in the prepayment provision, would have fully compensated VALIC for the 1999 Loan.

The transaction costs of making a commercial real estate loan are typically paid by the borrower. The costs of investing in a new bond investment are virtually zero.

13

In the opinion of Jeffrey S. Flinn, the Director of Mortgage Loans of AG, VALIC's parent, the prepayment provision at issue is "very, very punitive."

## CONCLUSIONS OF LAW

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, and venue is proper pursuant to 28 U.S.C. § 1391.

Because jurisdiction is based upon diversity of the parties, whether a provision is an unenforceable penalty or a liquidated-damages clause is a matter of Illinois law. *See Checkers Eight Ltd. P'Ship v. Hawkins*, 241 F.3d 558, 561-62 (7th Cir. 2001) (*Checkers Eight*).

Courts have recognized that the economic loss that a lender may suffer as a result of prepayment may be speculative and difficult to quantify. *See In re AE Hotel Venture*, 321 B.R. 209, 220 (Bank. N.D. Ill. 2005); *In re Hidden Lake Limited Partnership*, 247 B.R. 722, 728-29 (Bank. S.D. Ohio 2000).

Illinois uses the law of liquidated damages to determine whether a prepayment provision is a penalty. *Auto Fin. Corp. v. Ridge Chrysler Plymouth, L.L.C.*, 219 F. Supp. 2d 945, 950 (N.D. Ill. 2002) (*Auto Fin. Corp.*). Prepayment provisions are not liquidated-damages provisions, *per se*. *See Auto. Fin. Corp.*, 219 F. Supp. 2d at 950. The exercise of a prepayment option does not constitute a breach of a loan agreement providing for prepayment; likewise, the prepayment premium is not a substitute for damages resulting from a breach. *See Auto. Fin. Corp.*, 219 F. Supp. 2d at 950-51. Illinois has adopted the test set forth in the Restatement (Second) of Contracts. *See Jameson Realty Group v. Kostner*, 351 Ill. App. 3d 416, 423 (2004) (*Jameson*). "Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss. A term fixing

14

unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty." Restatement (Second) Contracts § 356. "Whether a provision is a penalty clause is an issue of law . . . ." *Checkers Eight*, 241 F.3d at 562. Each liquidated-damages clause is evaluated on its own facts and circumstances. *See Jameson*, 351 Ill. App. 3d at 423. The burden of proving that a clause imposes a penalty rests with the party resisting its enforcement. *XCO Intern. Inc. v. Pacific Scientific Co.*, 369 F.3d 998, 1003 (7th Cir. 2004) (*XCO*). Based on the Restatement, three elements must all be met for a liquidated-damages clause to be enforceable: (1) the amount of damages was reasonable at the time of contracting in that they bear some relation to the damages which might have been sustained; (2) the amount of actual damages from a breach would be uncertain and difficult to prove at the time of contracting; and (3) the parties intended to agree in advance to the settlement of damages that might arise from a breach. *See Jameson*, 351 Ill. App. 3d at 423. A liquidated-damages clause is most likely not a reasonable attempt to estimate the actual damages if the amount of damages is unchanging in relation to the gravity of the breach. *See Checkers Eight*, 241 F.3d at 562.

For the prepayment fee to be unreasonable, it must be "clearly disproportionate to a reasonable estimate of the actual damages likely to be caused by a breach." *XCO*, 369 F.3d at 1003; *see also, Auto Fin. Corp.*, 219 F. Supp. 2d at 951. "The relevant question under Illinois law, however, is not the size of the liquidated damages amount standing alone. The question is the relation between that amount and the projected actual loss." *In re AE Hotel Venture*, 321 B.R. at 220-21.

As a matter of public policy, a liquidated-damages clause cannot merely serve as a threat to secure performance or punish nonperformance, *Jameson*, 351 Ill. App. 3d at 424; and contractual provisions that violate public policy are void, *Broxham v. Borden Farm Prods. Co. of Ill.*, 53 F.3d 946, 948 (7th Cir. 1931). Any monies paid pursuant to a void contract provision must be returned. *See Ransburg v. Haase*, 224 Ill. App. 3d 681, 686 (1992).

Under Illinois law, when a provision is held to be an unenforceable penalty, the victim of the breach is still entitled to its actual damages. *See Lake River Corp. v. Carborundum Co.*, 769 F.2d 1284, 1292 (7th Cir. 1985) (*Lake River*). The evidentiary burden to prove its actual damages resulting from a prepaid loan is on the lender. *See Lake River*, 769 F.2d at 1292; *Auto Fin. Corp.*, 219 F. Supp. 2d at 952.

"It is presumed that every clause in a contract was inserted deliberately and for a purpose." *Atlantic Mut. Ins. Co. v. Metron Eng'g & Constr. Co.*, 83 F.3d 897, 900 (7th Cir. 1996) (*Metron*). A court should not generally rewrite a contract and should only do so where clear and convincing evidence exists that properly reflects the true intent of the parties. *See Board of Trs. of the Univ. of Ill. v. Insurance Corp. of Ireland, Ltd.*, 969 F.2d 329, 332 (7th Cir. 1992) (*Insurance Corp. of Ireland*). "A contract is to be strictly construed against its drafter." *Lake Bluff Heating & Air Conditioning Supply, Inc. v. Harris Trust & Sav. Bank*, 117 Ill. App. 3d 284, 294 (1983).

In order to be a "prevailing party," for purposes of determining if attorney's fees are awarded pursuant to an agreement, there has to be a "judicially sanctioned change in the legal relationship of the parties." *See Federation of Advertising Indus. Representatives, Inc. v. City of Chicago*, 326 F.3d 924, 933 (7th Cir. 2003); *First Commodity Traders, Inc. v. Heinold Commodities, Inc.* 766 F.2d 1007, 1014 (7th Cir. 1985). A plaintiff that does not secure a judgment on the merits or a

16

court-ordered consent decree is not deemed a "prevailing party." *See Melton v. Frigidaire*, 346 Ill. App. 3d 331, 337 ( 2004).

## DECISION

To calculate the prepayment fee under the yield-maintenance clause at issue, the remaining payments on the Loan – including both the principal and interest owed to VALIC – are discounted to a present value at a chosen "reinvestment" rate; the reinvestment rate is the rate of a Treasury security with the closest maturity date to the date of the Loan's final payment. The balance of the principal owed is then subtracted. Therefore, the lower the reinvestment rate, the higher the prepayment fee. The prepayment fee should be the present value of: (1) the interest income from the remaining principal VALIC would have received under the Loan rate for the remainder of the Loan (2) minus the interest income VALIC would obtain if the remaining principal is invested at the reinvestment rate for the remainder of the Loan's term. In other words, the prepayment provision should represent the present value of the lost interest on the remaining principal over the term of the Loan if VALIC reinvested the principal in a comparable investment at the reinvestment rate.

River East argues that the reinvestment rate was unreasonably low because it only used the rate of a Treasury security of a similar maturity date of the Loan without any additional "spread" or interest points. Therefore, the rate based on a Treasury security rate alone is unreasonable because these securities have far less risk than a CREM loan – thereby relieving VALIC of the risks bargained for in the commercial real estate loan to River East. This results in VALIC's recovering lost interest by reinvesting the principal and prepayment fee in a practically risk-free treasury investment, or reinvesting the principal and prepayment fee in an investment with a risk comparable to the original loan and receiving a greater return. Under either scenario, River East asserts that

17

VALIC is overcompensated on its original investment – either through decreased risk or a larger return. Instead of using a treasury-based reinvestment rate, River East contends that a reinvestment rate of a Treasury security with an added spread (or interest points) would accurately reflect the risk VALIC undertook in making a commercial real estate loan to River East and, accordingly, adequately compensate VALIC for the prepayment.

Prepayment provisions that used a similar treasury-based reinvestment rate have been found to constitute an impermissible penalty. *See In re Kroh Bros. Dev. Corp.*, 88 B.R. 997 (W.D. Mo. 1988); *In re Skyler Ridge*, 80 B.R. 500 (C.D. Cal. 1987). In both of these cases, the courts held that if the prepayment provision was disproportionate and did not bear a reasonable relation to the probable damages, then the provision was a penalty and invalid. *In re Kroh Bros. Dev. Corp.*, 88 B.R. at 999-1000; *In re Skyler Ridge*, 80 B.R. at 504. In both cases, the courts found that the use of a treasury-based reinvestment rate without an additional spread constituted a penalty. *In re Kroh Bros. Dev. Corp.*, 88 B.R. at 1000; *In re Skyler Ridge*, 80 B.R. at 505. VALIC contends that the prepayment clauses in those cases were found to be invalid because they failed to discount the prepayment interest to a present value and are not controlling here. However, both courts indicated that the prepayment provisions would have been invalid based upon the choice of interest rate alone. *See In re Kroh Bros. Dev. Corp.*, 88 B.R. at 1000 (explaining that lender was able to reinvest in a rate higher than the Treasury rate and, therefore, obtain overcompensation); *In re Skyler Ridge*, 80 B.R. at 505 ("It would have been permissible for the parties to choose an index rate such as that for U.S. Treasury notes that differs from the market for long-term mortgages, provided that some appropriate adjustment to bring this rate up to the first mortgage rate were included. However, the

parties included no such adjustment in the formula in the promissory note. Thus the Court finds this feature in the promissory note is unreasonable.").

Other courts have found prepayment provisions enforceable. However, these are distinguishable from the instant case. The prepayment provision in *In re Lappin Electric Co.*, 245 B.R. 326 (Bank. E.D. Wis.) (*Lappin*), provided a sliding percentage fee that decreased over the life of the loan. The loan in *Lappin* was, unlike the loan here, a line of credit, of which the outstanding amount could rise and fall daily; therefore, because of the type of loan, the likelihood of considerable fluctuation, and the possibility of manipulation by the borrower, the sliding scale prepayment provision was found to be reasonable at the time of contracting and bore some relation to damages that might have been sustained. *Lappin*, 245 B.R. at 329-30; *see also, In re Schaumburg Hotel Owner Ltd.*, 97 B.R. 943, 953-54 (Bank. N.D. Ill. 1989) (prepayment fee of 10% of the outstanding indebtedness that decreased as the note was paid off was a reasonable estimate of the possible damages lender would incur and would not have effected a windfall to lender); *In re Vanderveer Estates Holdings, Inc.*, 283 B.R. 122, 130 (Bank. E.D.N.Y. 2002) (contrary to the provision at issue here, yield-maintenance provision did not result in automatic premium to the lender not a penalty because, if interest rates equaled or exceeded the interest rate under the note, the *prepayment premium per the calculations would be zero*).

VALIC argues it is entitled to use the lower treasury rate because of a "lag period" of six to eight months between the date River East provided notice of its intention to prepay (thus fixing the reinvestment rate) and the date VALIC would be able to reinvest the prepaid funds. VALIC claims it may not be able to recover its investment if interest rates drop below the reinvestment rate during this time-lag period.

19

However, this argument and the assumption upon which it is based (though not supported by the evidence) is a product of VALIC's draftsmanship of the prepayment provision. The prepayment provision requires Plaintiff to give "at least sixty (60) days' prior written notice of such full prepayment." As the party responsible for incorporating that provision, VALIC cannot now complain that the 60-day period is insufficient. *See Liautaud v. Liautaud*, 221 F.3d 981, 986 (7th Cir. 2000). VALIC could have drafted the clause to allow a "reinvestment rate" based on either the date of notice to prepay or the date of prepayment, whichever is lower, to compensate for any lag time in receiving the funds and reinvestment. Furthermore, contrary to the premise upon which VALIC's argument is based, the evidence at trial showed that the "lag time" for VALIC's reinvestments, at all relevant times, was generally less than six to eight months and that VALIC could reinvest the funds within days if it so chose. In addition, contrary to VALIC's argument, the evidence showed the CREM loan rates, at all relevant times, were not as volatile and subject to substantial change as VALIC contends. Moreover, reinvestment in government securities and corporate bonds at comparable risk and return would have adequately protected VALIC and were available with no effective "lag" time; and these opportunities were known to VALIC when the loan was executed.

Furthermore, the alternate one-percent-minimum section of the prepayment provision (part (2) Paragraph 4 of the Note) protects VALIC from "lag-time" losses. VALIC contends that, assuming it could reinvest at the same 127-basis-point spread over Treasuries as the original loan, VALIC would be undercompensated if, during the "lag time," Treasury rates fell more than 127 basis points. However, if, when notice of prepayment is given (the beginning of the "lag-time" period), the rate of Treasury securities is higher than the loan rate of 8.02%, the one-percent-minimum

20

provision, not the yield-maintenance provision, of the prepayment clause would apply. Because the prepayment premium amount would be locked at one percent of principal in those circumstances, there is no risk of "lag-time" losses.

VALIC also argues that contracting loan spreads and changing rates justify the use of the Treasury rate. According to VALIC, the loan spread – the differential between the Treasury rate and the amount a lender can receive in a mortgage – is subject to negotiation and market pressures and, therefore, may decrease over time. Defendant thus argues that it is entitled to use the lower Treasury rate as the reinvestment rate to protect against these risks.

However, the prevailing interest rate on a Treasury security will always be lower than the prevailing rate on a commercial real estate loan because of the difference in risk of the latter. In addition, as set out above, VALIC does not explain why a loan spread could not have been calculated to account for changing spreads to insure that, while VALIC would not suffer a loss from prepayment, VALIC did not receive a windfall, as here. For example, without the loan spread, if VALIC reinvested the prepaid monies at the same interest rate of the River East Loan (8.02%) at the time of prepayment, VALIC would not have lost income but would have still received a prepayment fee of approximately $1.6 million. *See Checkers Eight*, 241 F.3d at 562 (liquidated damages clause is most likely not a reasonable attempt to estimate the actual damages if the amount of damages is unchanging to the gravity of the breach); *Cf. In re Vanderveer Estates Holdings, Inc.*, 283 B.R. at 130 (prepayment yield-maintenance provision that did not result in automatic premium to the lender not a penalty - if interest rates equaled or exceeded the interest rate under the note, the *prepayment premium per the calculations would be zero*).

21

Significantly, Flinn, the Director of Mortgage Loans of AG, VALIC's parent corporation, believed prepayment provision was "very, very punitive," serving only to punish nonperformance.[6] *See Jameson*, 351 Ill. App. 3d at 424.

Based on the above, River East has proven that the amount provided in the prepayment provision of part (1) of Paragraph 4 of the Note was not reasonable at the time of contracting and did not bear some relation to the damages which might have been sustained. *See Jameson*, 351 Ill. App. 3d at 423. Accordingly, this part of the prepayment provision based on the yield-maintenance clause is a penalty and is unenforceable.

Even if, contrary to the evidence, River East failed to prove that the amount of damages was not reasonable at the time of contracting and did not bear some relation to the damages which might have been sustained, River East has met its burden of proof that the parties did not intend to agree in advance to the settlement of damages that might arise from a breach.

A question regarding whether or not the prepayment provision would not be enforceable because it constituted a penalty were expressed by MCL to VALIC prior to closing the Loan. MCL, through its counsel, told VALIC's counsel the provision was punitive and questioned its enforceability; and the opinion letter that was required by VALIC from MCL's counsel contained a "carve out" as to the enforceability of the prepayment provision. The prepayment provision remained at VALIC's insistence that the provision was not subject to negotiation.

---

[6]An adverse inference is drawn from VALIC's failure to call Flinn as a witness at trial to explain his prior testimony because Flinn is AG's current employee, is in AG (VALIC'S) control, and lies more than 100 miles from Court. *See Oxman v. WLS-TV*, 12 F.3d 652, 661 (7th Cir. 1993).

Because the yield-maintenance clause of the prepayment provision is an unenforceable penalty, the prepayment provision's second clause – part (2), Paragraph 4 of the Note – providing a prepayment charge of 1% of the remaining principal on the loan, determines the prepayment fee. To determine a prepayment fee based on some other basis formula would require the Court to rewrite the contract to impose a prepayment rate not based on an agreement between the parties. A valid and alternate provision (part (2), Paragraph 4) demonstrates the intent of the parties. *See Insurance Corp. of Ireland*, 969 F.2d at 332.

Further, there is no evidence of any actual damages VALIC suffered by allowing River East to prepay the Loan.[7] As noted above, VALIC chose not to segregate the funds prepaid by MCL so that the actual return on reinvestment could be determined. Because "it is presumed that every clause in a contract was inserted deliberately and for a purpose," River East is required to pay 1% of the outstanding balance on the loan. *See Metron*, 83 F.3d at 900.

The parties dispute whether notice was received by VALIC on April 21, 2003 or April 22, 2003. Based on the facsimile produced at trial, River East provided notice of its intent to prepay the Loan on April 21, 2003. At the time of the prepayment, River East owed a principal amount of $12,301,215.00. One percent of this amount equals $123,012.15. Based on the total amount River East provided VALIC for the prepayment, River East is entitled to a refund of $3,762,666.85.

---

[7]The Court previously granted River East's motion to bar evidence of VALIC's actual costs because VALIC, although specifically requested by River East, failed to produce any evidence of actual damages prior to the close of discovery.

23

In light of the above findings, River East's alternative claim, seeking a refund if the prepayment provision was upheld, is moot. Furthermore, VALIC's claim for attorney's fees is denied because River East is a "prevailing party" on the merits of this action, *i.e.*, that the prepayment provision based on the yield-maintenance clause is a penalty and is unenforceable. River East is also the prevailing party based on its refund of $826,922.27 received because of VALIC's previous error. This error was discovered by Morrow after, and as a result of, the suit that was commenced by MCL in the Circuit Court of Cook County, Illinois.

Similarly, VALIC's third-party claim against McLean for costs, fees, expenses, and other indebtedness incurred by VALIC fails. McLean personally guaranteed "all obligations to [VALIC] for which [VALIC] has full recourse to [River East] pursuant to Section 19 of the Note." Section 19 provides that "[VALIC] shall have full recourse against [River East], and Plaintiff shall be personally liable for and shall promptly account (by delivery of funds) to Defendant" for certain categories of damages, including "all costs, attorney's fees and expenses incurred or expended by [VALIC] in collecting any of the foregoing or due to any default in the performance of the foregoing or in enforcing any right granted to [VALIC] under Section 19 of this Note." Neither the prepayment penalty nor VALIC's costs and attorney's fees it incurred in defending the terms of the Note are listed in Section 19 of the Note as "obligations to Lender for which Lender has full recourse to Borrower."

## ORDER

IT IS THEREFORE ORDERED that judgment be entered in favor of Plaintiff, River East

Plaza, L.L.C., on Count I of River East's Second Amended Complaint. Judgment is entered against

VALIC on its counterclaim and third-party complaint.

Date: September 22, 2006

JOHN W. DARRAH
United States District Court Judge

25